Thank you, Your Honor. May it please the Court, my name is David Senior and I represent Petitioner Colin Dickey. I'm here with my colleagues, Anne Tria from my office and Matthew Weston, formerly from my office. I'd like to reserve ten minutes for rebuttal, please. The California Supreme Court found, and I quote, the prosecutor did knowingly fail to correct the false impression, indeed knowingly exploited the false impression in his argument to the jury, that the prosecution had not done Gene Buchanan any favors that might reflect upon his credibility. Under 28 U.S.C. § 2254 D, the threshold questions for this Court are, one, whether the state court rendered a decision that was contrary to or involved an unreasonable application of Nephew v. Illinois. Two, whether the state court unreasonably failed to examine the complete facts in the record. And three, whether the state court unreasonably misstated the facts in the record. Indeed it did, as to all three issues. This aiding and abetting Fresno County murder prosecution of Colin Dickey is based on the testimony of Gene Buchanan, an admitted cocaine and heroin dealer. His purported observations and testimonies two years later were enveloped by his own intravenous cocaine and heroin use. Could the trial result have been different if, by correcting the record regarding Gene Buchanan's testimony, the jury became aware that Buchanan was knowingly creating false impressions in order to deceive them about his honesty and motivations? Counsel, on this point, you're stressing Mr. Buchanan's testimony, and of course there was also the testimony of Ms. Goldman, right? And my understanding is that she did not testify in her preliminary hearing testimony that was, I think, played or read to the jury, that she did not corroborate Buchanan's statement to the effect of, if you kill one, you may as well kill them all. That's correct. Is that correct? That's correct. Okay, so when I look back at how that happened, her description is that Buchanan got upset watching the news, called her into a bedroom, he heard what was going on and sort of followed in there, and that after getting into the bedroom, Dickey apparently said something like, since I've, according to Buchanan, since I've already told her, I may as well tell you, and then retold the tale. In other words, Goldman would have been present for the first telling and the second telling, according to her, not testify that he said, if you kill one, you may as well kill them both. But I can't find any place where she was confronted with that and asked about, did she hear it also or not? Is that right? She never, in her testimony or in her statements to the police, that never, she never said that. Well, yeah, okay, that's the first, you've already answered that question, but was she confronted with the fact that Buchanan did and asked her, didn't she hear that as well? Was she ever confronted with that? During her preliminary hearing? Anywhere, anywhere. Not that I know of. Okay, thank you. Had Buchanan ever said that before? I mean, he says this in testimony at trial, this somewhat ambiguous statement as to whether or not Dickey had said that out loud or had merely thought it, but clearly that there was in his head, you kill one, you might as well kill them both. Had Buchanan testified to that before, that is to say, was that even somewhere floating in the atmosphere so that Goldman could have been confronted with that statement and asked whether it was true? I don't know whether he was asked that question at the preliminary hearing, but I believe he testified after. I know he testified after the preliminary hearing. I'm asking, was that statement ever made before so that there would have been an opportunity to ask Goldman whether it was true? No. Okay, so what other evidence or was there aside from that statement to support the intent to kill? None. The California Supreme Court thought otherwise though, right? No, they didn't. Didn't it say there's other evidence in which the jury could have found intent to kill because Buchanan, forgive me, Dickey, there's the ligature to the robbery and he knew he wouldn't have needed that because the victims were old and infirm. In a concluding paragraph, the California Supreme Court tells a tale of the jury was entitled to find the following. However, they never conduct that analysis within a pew background of, could they have said that if they had corrected the false evidence from Buchanan? So in other words, they're using the false evidence from Buchanan to build their intent story. They say, first of all, there's no evidence that Colin Dickey took a cord to the crime scene. There's no evidence that Colin Dickey took a knife to the crime scene. There's no evidence that Colin Dickey was at the crime scene. Well, just back up because I think we're getting off the track of Judge McGee's question and this is an important point, I think probably for all three of us, but right, her question had to do with, is there anything other than proving intent to kill other than Buchanan's statement that he attributes to Dickey about if you kill one, right? According to the prosecutor. Okay, so what do you do with this other evidence or reasoning of the California Supreme Court that I've just mentioned? Do you that doesn't discount Buchanan's testimony for giving false evidence to the jury? Okay. So it's all built on Buchanan. So you're arguing that whatever the Supreme Court said was unsupported. Is that what your argument is? There is no support for it except for Gene Buchanan. What about Goldman's testimony? Could they not have found there was some circumstantial evidence from Goldman that he, that Dickey could have taken a knife or the cord? You think not? No, Goldman says, I have a knife that looks like that. She also said it was in storage. In storage. Right. She said, R.C. went into the closet where the blind was, not Colin Dickey, R.C. Eight times, eight times during a preliminary hearing. Okay, so I don't want to take up a lot of your time, but I think your answer to Judge McGee's question and sort of my tag on is that you think that the, not that there wasn't any, but that the California, if I asked did the California Supreme Court think there was other evidence of intent and you answered no, and it sounds like the answer is in context, really, you think it was not supported by the evidence. Is that right? It's, yes, it's not supported. Okay. Thank you. And I appreciate that clarification. So what's, what's your best authority, Ninth Circuit preferably, applying AEDPA deference that the California Supreme Court's rejection of Dickey's NAPU claim was unreasonable? Well, I'll start with NAPU. NAPU requires that the court analyze materiality with a view toward what would have happened if, as obligated, they corrected the record. And this court has said in SEVAC, in Hayes, in Jackson, that's the way this court analyzes it. If they had corrected the record, the witness would have no credibility. If they had corrected the record, it would have been catastrophic for the prosecution if they had corrected the record, and that's the view. Because it would have, there's two false statements, right? One correction would have been, well, actually, you met with the prosecutor 12 times, not a couple. And the other correction would have been the, you have talked to somebody from the DA's office, you contacted Martin, and Martin facilitated contact with Strickland, who's providing you room and board free of charge. There's more than that. There's, you had a $25,000 credit? But I don't think there's any, any evidence that the prosecutor knew about the $25,000 credit. Does it come in every month? There's no $25,000 credit on there. There's no $25,000 credit. California Supreme Court found that he did not, the prosecutor didn't know that that was a false statement. You think that's also unsupported? Totally unsupported. First of all, they say that he was going to pay the benefits that he received with a reward. The evidence, clearly before them, and all the invoices, is that he got $9,100 plus in benefits, room board, cash advances. You're not paying them. Counsel, what is, what evidence was there that the prosecutor knew that Buchanan had not done a maintenance work for Strickland? Because she called him repeatedly, number one, and gave him invoices repeatedly for over the period of two years showing what was owed, and there was no credit on there for $25,000. $25,000 credit for managerial service. I'm asking a different question. You appreciate I'm asking a different question, and that is, I don't see any evidence, please correct me if I'm wrong, that the prosecutor knew that Buchanan was not doing maintenance work for her. If he knew that was a false statement. The evidence is the invoices that he got on a regular basis, on a monthly basis, showed what Buchanan owed her, and there's no $25,000 reference in there over the course of two years. One thing that strikes me, and maybe I'm missing something, the prosecutor asks Buchanan, at any time have you spoken with anybody who's told you it was from my office and the DA's office? No sir, only when they've come to pick me up at the court question. You talked to me a couple of times, is that right? Yes sir. Well, it wasn't a couple of times, it was a dozen times. At least, at least a dozen times. Does the California Supreme Court ever deal with that? Never. I mean, they, well, deal with it, they, I think that's quoted in their opinion. Well, this part's quoted, do they talk about the dozen times? I mean, I just read from the opinion, because they're quoting that testimony. Does the California Supreme Court ever say that, in fact, that that was a lie? No. Put into the mouth of the witness? It's not just false testimony, it's leading question producing the false testimony, and the prosecutor knows it, knows darn right that it's not just a couple of times. But does California Supreme Court ever deal with that? No. That's an unreasonable failure to examine the complete facts in the record under 2254 D2. And it's important, it's important. Let me explain why it's important. I quote, it's pretty clear Buchanan was not prepared to testify, that it was not scripted. Counsel, we can hear you very well, and I don't, I think you'd serve your client, I know there's a lot at stake here, but I think you'd serve your client better if you could calm down a little. Okay, I'm sorry. Don't make me turn off my hearing aid. All right. I'm sorry. Go ahead. I'm sorry. If you could go ahead and read your quote. It's pretty clear Buchanan was not prepared to testify, that it was not scripted to testify. The DA's closing argument. That's the DA's misrepresentation to the jury predicated on Buchanan's uncorrected, uncorrected false testimony that the DA met with Buchanan only a couple of times, a couple of times, not a dozen or more times. He uses that, and then he argues it, and he does it over and over. And on that, the California Supreme Court said he not only failed to correct, exploited it, right? It's not a hostile observation. It is rare for us to see something like that from the California Supreme Court. I'm not a hostile observer. Okay, I'm sorry. So tell me, help me with materiality, because apparently the California Supreme Court, when it comes down to, apparently didn't think any of these two items, I mean one they didn't really talk about the number of times that he had been in contact with the prosecutor, and then the other regarding the arrangement, financial arrangement. The takeaway from the opinion of the California Supreme Court is that that was not material. So help me, and I'm trying to figure out, because we don't get a lot of NAPU claims, at least I haven't, and I'm just trying to figure out how do, where do we look to determine whether that was material so that we can determine whether or not the California Supreme Court's decision was reasonable or unreasonable. Okay, first of all, two things. Two claims were raised on direct appeal. Mooney, knowing presentation of false evidence. NAPU, the failure to correct knowingly presented false evidence when it appears. There's a materiality analysis. Well, first of all, was there false evidence presented? They had decided yes, there was. Okay, satisfies one prong on Mooney, the first prong on NAPU. Can I stop you there to just, is it your understanding that's contested, that those are false statements? It's not contested. It's not your question. I'm just asking you whether it's your understanding that that's, my understanding is it's not contested. California Supreme Court made that finding. Okay, you're still not answering my question. Okay, it's not contested. Thank you. So it made one of the findings, right? It didn't address the other. It didn't address the 12 versus a couple. Correct. Okay. Correct. So what material? Okay, so now knowing presentation of false evidence, they had knowingly presented false evidence. Under Mooney, now you decide, was it material? Did it impact the verdict? Under NAPU, you decide, was it material? If it had been corrected, would it have affected the verdict? Could it? Could it? I'm sorry, thank you. Thank you. Could it have? Could it have affected the verdict? The California Supreme Court does not analyze NAPU. They frame the question as NAPU. They decide the question as Mooney. That is a complete failure under 2254 D1 to apply NAPU to these facts. Okay. Is the material, materiality standard different for Mooney and NAPU? It's factually different. It's legally the same. What does that mean? Okay. Could the outcome have been different? Well, here's the NAPU standard, which I've written down. Any reasonable likelihood that the false testimony could have affected, that's NAPU. Is the Mooney standard different for Mooney? Same. So it's the same standard. Same. Factual analysis is different. What would have happened under NAPU if it had been corrected? Examine those facts. Examine those facts, for example. Okay. So do that. I'm just trying to figure out the materiality. Number one, number one, the jury was instructed that if he was dishonest, they shall, shall distrust his testimony. One. It's not hypothetical anymore. They know it's been corrected. They now know he was dishonest. They shall distrust him. One. Two, the jury was instructed if he was dishonest and if he had lied, you may disregard his testimony in its entirety. The standard here is, could it have been different? Could they have disregarded all of his testimony? That's a game changer. That's over with. No, it's not could it have been different. It's even more favorable to you than that. Is there a reasonable likelihood that it could have been different? Number three, under materiality, if the prosecutor had corrected his statements, for example, you're not really exposed to a death sentence for lying because I'm orchestrating your deceptive testimony. What would the jury think of the prosecutor, not only the witness? That's an NAPU analysis on record correction that doesn't exist under NAPU. And so how about Ninth Circuit authority to support that? Ninth Circuit authority to support that is as follows. This court and the U.S. Supreme Court and NAPU, they analyze NAPU under what would have happened if it had been corrected. The California Supreme Court didn't do that. This court did it in SEDAC. This court did it in Jackson. This court did it in Hayes. And to some degree, although they found a Mooney error, they did it in Dow. And I can give you the – I can read you the – one second, please. Some of the cases you just read are pre-EDPA cases, so it would be helpful if you've got a post-EDPA case. SEDAC, Jackson, and Hayes, but still the – Not Jackson. Not Jackson. I'm sorry, SEDAC and Hayes are pre-EDPA. Dow and Jackson, stand directed, are EDPA cases. But that aspect of NAPU is not an EDPA question. It's what do you do when the state knowingly presents false evidence, and what you do is, did they correct it? Oh, they didn't correct it? Well, let's examine what would have happened if they had corrected. That analysis is the same pre-EDPA as it is with SEDAC. And as this court said, witness, quote, credibility is irreparably damaged upon NAPU correction. That's SEDAC. Correcting the informant's perjury would have shown that these witnesses had a strong incentive to lie. That's Jackson. Record correction would have had, quote, a devastating effect on the credibility of the entire prosecution case. Counsel, we've read all those cases. So it would be helpful for me, at least my part, if you could engage in what the California Supreme Court said about this and why you think they're wrong. Why were they unreasonable? Not a word. They didn't say a word about NAPU. They didn't say a word about what would have happened had the record been corrected. Well, could you engage in the analysis that they gave us, please? That would be helpful to me. Okay. They said the jury, and I'm paraphrasing, but you know, they said the jury already knew that he was motivated to lie because he was motivated to get the reward money. Why is this referred to? There's not a word about this, honestly. If you don't want to make the argument, fair enough, but I'm just suggesting that it would be helpful for me if you would engage in what they gave us and tell me why you think it's incorrect. Unreasonable. It has to be unreasonable. Okay. They frame the issue as NAPU. Okay. And they decide the issue without discussing materiality under the NAPU standard of record correction. They decide the issue twice under Mooney. Would it have been different if Buchanan didn't lie? That's different than would it have been different if the record had been corrected? What would have happened then? That's helpful. Thank you. Do you want to reserve the rest of your time, or do you want to keep going? Okay. Good morning. May it please the court, Justin Riley on behalf of the respondent. I'd like to start first with one of the panel's questions about the kill one, you might as well kill them both. Intent to kill. There was evidence in the record in the state Supreme Court relied on Dickey's preparation of the weapons, the knife and the ligature. Did they rely? Because the briefing here, it seems to me that my word is uncontested, but it seems the parties here agree that the evidence that they had for the special circumstances was really Buchanan's statement. But Goldman did not reiterate it, and I can't figure out why she didn't, because she was in the room. It seems to me that in the party's briefing, did you concede the point? The state Supreme Court did not analyze intent to kill in light of the NAPU claims. It wasn't raised that way in the state Supreme Court. There were many, many claims raised, and intent to kill was something separate from the NAPU analysis. And so the state Supreme Court's analysis of the intent to kill is presumed correct, and the petitioner hasn't shown otherwise. And some of the evidence... Wait a minute, hasn't shown otherwise? I mean, what bothers me about this case is that we've got false testimony elicited by the prosecutor, and then he relies upon that false testimony to show intent to kill, which is the special circumstance. I mean, you can get him on the conviction for aiding and abetting, I get that. But definitely hinges upon intent to kill, and the intent to kill comes from a statement out of Buchanan that's only made by Buchanan, and Buchanan turns out to be a liar, and some of the lies that he tells are induced by the prosecutor. And then the prosecutor relies on the lies to bolster Buchanan's credibility. What am I missing here? The intent to kill doesn't just come from that statement. The intent to kill came from the preparation of weapons. Now, tell me about the preparation of weapons, because we've got testimony from Goldman that says, that weapon, that knife, it was my knife, that's in storage, and it was R.C. who was in that drawer. Dickey was not in that drawer. Buchanan says he was in that drawer, but Goldman says he wasn't. That was her preliminary hearing testimony. Well, of course it's her preliminary hearing testimony. It's also a trial testimony. That's all we've got. I'm sorry, forgive me for interrupting. Importantly, Detective Stokes took the stand at trial and testified to inconsistent statements that Goldman made. Goldman admitted to him prior... That's what he says. Yes, that's what he says, she said, and the credibility is up to the jury to decide. But that is the issue. Are you saying she might not be credible? Because you're relying on her for a lot of other things to establish guilt, even if it's related to the non-special circumstance of intent to kill. I don't know if you have to tread carefully there or not. There were credibility issues throughout the trial. That has to both Goldman and Buchanan. And Dickey, as the prosecution, and I'm paraphrasing, argued to the jury in closing, all these interactions occurred in hell. There were no saints there at this apartment, and they were all discussing things together. There were lots of conflicting statements. But one of the things that Goldman and Buchanan were always consistent about is that Dickey confessed to them. No, it was a robbery. It's an attempted murder. She says, I think, three, maybe four times that Dickey said to her, I had nothing to do with the murder. Where in her statement does he confess to murder? It doesn't happen. That's correct. This is an eight or and a better theory. Right, right. But there's a special instruction that needs to be given where the jury has to determine that he had intent to kill, even under eight or and a better, correct? Correct. So I'm struggling, and I'm going to give you every opportunity to find the evidence that supports the intent to kill that doesn't come from Buchanan. And in fact, the only thing that I can see that comes from Buchanan is that one statement that Buchanan claims that Dickey said about if you've got to kill one, or if you have to do one, you have to do them all. But even then, it wasn't really clear. Tell me where in the record we can get better context. It wasn't really clear whether Dickey said that at the time, if he said that in talking to them at the time of the murder when that was happening or with everything, or if that was just a comment made in retrospect. So we really don't have a lot of context. And to me, that's your main evidence, if any, to support the intent to kill. So I want to give you every opportunity. Thank you. Again, the preparation of weapons did come from Detective Stokes. If the jury believes Detective Stokes that that was an inconsistent statement made by Goldman, they believe Dickey prepared both the knife and the ligature. And if they believe Buchanan, the ligature was used on the man before he was back in the bedroom. That's correct. But not by Dickey. In preparing the weapons, the jury could infer that Dickey had an intent. So this goes back to, I don't want to spend a lot of time on this, because this goes back to now you needing to impeach Goldman, right? Right. Okay. And so if you say it comes from Stokes, right? If it comes from Stokes... Goldman's testimony comes from Stokes about the preparation. Right, right. But we're looking at Stokes' testimony. So then it seems like, okay, maybe that's evidence, but it's thin. And so Napoo tells us, hey, we have to look at the statement, and then if the evidence is thin, even more emphasis on the false statement that was presented by the prosecution. But you tell me how you would respond to that. First, I would respond that a fair-minded jurist could argue that evidence isn't thin at all. Much of a detective's... On the murder for Dickey, the evidence wasn't thin? The evidence of preparation of weapons. Well, we're talking about the evidence of murder. Intent to kill. Intent to kill for Dickey. Give me all of it. The evidence, and unfortunately I didn't look over the intent to kill claim that was raised in the undirected appeal and in the district court. But as I recall, the evidence was the one witness providing all of the evidence to convict or to find death. In your briefing and everything you say, it seems like that's what you're pointing to. I mean, it seemed like it was undisputed that the evidence that you're looking at for intent to kill came from Buchanan. Did you do the brief on this? I did, and I don't remember discussing intent to kill all that. Like I said, intent to kill wasn't an issue that was raised here on appeal. It wasn't certified for appeal, so I didn't prepare necessarily. Well, but it had to have been, because the entire NACBU claim is based upon, well, do we leave Buchanan, and do we set aside the death penalty? I mean, that's the central question. I definitely agree that his credibility... It wasn't raised. Right. It goes to all of his testimony, but I didn't collect all of the evidence on intent to kill. But as I recall, the state supreme court did mention both the preparation of weapons, which was Goldman's testimony through Stokes, and it was Buchanan's statement about you kill when you kill to both. So you're back to the preparation of weapons. Anything else? Yeah. No. So it's the preparation of weapons and Buchanan's statement. And in your perspective, that's compelling or not then? I believe that the jury could find it compelling, and they did. Can I just clarify for my notes a couple of things? I want to know if the state, please, if the state is contesting these two statements, there's actually three, right, in that first colloquy, that they're false statements, and the prosecutor knew it, so that he would have had to at least correct them, right? So the first, at any time, have you spoken with anybody who's told you they were from my office, from the DA's office, and the answer was from Buchanan, no, sir, only when they come to pick me up. False statement, right? Because Buchanan had reached out to Martin. He had talked to other people from the DA's office. That's a false statement, isn't it? He definitely had. And it was my argument, though, that he didn't understand the question, because the follow-up questioning in context made it clear that... It's a false statement. It was definitely incorrect, yes. And the next one, you've talked to me a couple of times, is that right? And he says, yes, sir, false statement. The number should be 12, yes. Right, false statement, okay. Or maybe more. But I'm just trying to make sure, right, that that's not contested today. We're just talking materiality as to those two. And then the third one, at any time, the folks who've come to pick you up, have they bought you anything? Not a single thing, sir. And on this one with the California Supreme Court, that left a false impression. So I want to be sure that I'm contesting, for purposes of the NAPU claim, we're just talking about materiality. That's correct. Okay. Then I'd like to ask you a question, if I could, about, if my colleagues don't mind, to switch to the Brady claim. Sure. Claims. Because the first Brady claim really goes to the notes that the prosecutor made about this incident, where Buchanan tried to tell the prosecutor they had a secret deal with another DA to get what their briefing referred to as a get-out-of-jail-free card. You know the incident that I'm talking about. Is it your contention that those notes were improperly withheld pursuant to Brady? No, the prosecutor didn't view Buchanan's interaction with him as a lie. He... He said he was livid, it was a ridiculous lie. Not only a lie, a really dumb lie, because all Hayhuss had to do was talk with his colleague. So it's a lie. I'm trying to figure out whether you're contesting that it was a Brady, you know, that it was false, and that it needed... It could have been used to impeach. It could have been used to impeach. Should have been produced. It should have been produced, yes. So your position, the state's position, is that that's the first Brady claim, and it fails on materiality? Yes. Okay. And then the next one I'd like to talk about is the prosecutor's failure to disclose that Buchanan had met with him at least a dozen times. My understanding is that your position is that that was also something that would have been impeachment, and it wasn't disclosed, and that that fails only on materiality. That's correct. Okay. So on the materiality analysis for those two Brady claims, it seems to me we decide, you know, would, not could, would it have made a difference. It's a tougher stand than the poo, right? Sure. Okay. So when we decide, when we conduct that analysis, we look at the two bits of evidence that were not produced, that we've just reviewed, and compare it to what was in the record, right? Yes. And as opposing counsel was saying, we also analyze whether, how the trial would have been conducted had that evidence been presented. Right. So that's helpful to me, because in this particular case, the very same evidence is going to key, the same issue, because this trial circulated all around Buchanan's credibility, right? That was a central issue. That was a central issue for sure. But at any rate, the rest of the, for purpose, here's my point, here's my question. For purposes of the Brady analysis on materiality, we compare these two bits of evidence that were withheld against what was in the record, and what was in this record are the two false statements we've talked about for purposes of NAPU. And it seems to me that's part of the materiality analysis. And then the state seems to me to be between a rock and a hard place, which is why I want you to have an opportunity to discuss this, because one of the false statements was Buchanan saying, under oath, I met with you a couple times in response to a leading question from the prosecutor. And then on the Brady claim, if that's produced, it's, well, actually it was 12. So then, right, when we get to Brady, materiality, I appreciate the bar is higher, but what the jury knows is that he's just, he's just lied under oath. Okay. Right. He's just lied under oath, and they also know he's willing to lie to the prosecutor. Okay. Well, I would say it differently, willing to lie because the prosecutor induced the lie. I mean, the prosecutor said a couple of times, right? Yes, sir. Meaning that wasn't his testimony unprompted. The prosecutor induced the false testimony. It's a tough spot. And I want to hear your response, but you see the problem. Buchanan's credibility is central here for the reasons Judge, Chief Judge McGee has mentioned. And they not only have this, these false statements that I think you conceded, and I appreciate your candor, they didn't get corrected. Right. And then the state did also, it's a double whammy, not a legal term, but it is a double whammy. And it's because under the and it's nowhere else on the Brady claim, the materiality analysis folds them together. Now I'll be quiet and let you answer. Okay. I appreciate the question. I'm going to cut straight into the prosecutor's summation. Now, Buchanan's credibility was hotly contested. His credibility was not a central issue to the case in this way. He was a liar and a con and a thief. And the prosecution admitted all of that. And I'm just going to summarize the summation, which is at volume four of the excerpts of record at ECF 181 to 84. This is what the prosecution admitted to the jury in his summation. Buchanan had a flawed memory. He had a difficulty remembering details. He made conflicting statements. He makes you not want to believe him because we're getting all these different stories. He's a junkie, a drug addict, streetwise sleazy, doesn't work, not an angel. You wouldn't want to live by him. You can't believe everything he says. He's a con. He's no angel. He's no saint. He's no priest. He lives in hell. He's a liar. He's a thief. He'd lie for $5,000. He'd lie to send a man to prison. And he'd especially lie to send a man to prison if he didn't like that man. Now, we had... He went on to say something about just because all that doesn't mean he's not telling the truth here. And he went on to tell the jury, gee, he's been told that if he lies here in this capital case, he could wind up facing the death penalty himself. What the jury didn't know is he'd lied under oath in this trial. And if the prosecutor had met his NAPU obligations and certainly in the Brady materiality analysis, the jury actually would have known that. There were several lies that he told the jury under oath. The first, he told witness Buchanan, I'm sorry, he told witness Goldman that he was turning in Dickey for the reward. Then, on direct examination, he said, the only reason I came forward is because of my Christian upbringing. That's a lie. It's just a lie. There were all of these lies. Throughout the record, he would tell a witness something, that witness would testify, and then he would testify to the opposite. One of those is untrue. Well, exactly. One is untrue. And the jury had to make a on a lot of these. But to know in actuality, I mean, can be is very different. In fact, I think that's what NAPU is all about. Because what you're arguing here is consistent with you've been arguing all along, and that Buchanan's false testimony could not have changed the outcome of the case, because they knew it was a lie. But it seems like under NAPU, the opposite is true. In fact, when a key witness's credibility is already in question, confronting him with his lies on the stand would almost always affect the jury's judgment. Wouldn't it? I mean, that seems what NAPU is telling us. No, it doesn't have to. And here, the state Supreme Court viewed the evidence of him lying under oath to all these different people. I don't know that the jury would have known that he'd lied under. They'd know that he'd lied, perhaps, to Goldman, lied in the past, that he had, as you said, he had his drug habit, and on and on. But if these obligations had been followed by the prosecutor, the jury would have known absolutely his lies had continued into the trial and under oath. And that he apparently was not dissuaded by facing the death penalty, which was the other thing that he argued in closing. That's all right. Just focusing on the one lie of the reward, he testified that he came forward months after Dickey confessed to him and came forward because he saw in the window of a convenience store a reward poster. He didn't come forward to police. He came forward to the clerk. The clerk called the private people. He talked with the private people and had to be convinced to speak to police. That's not Christian upbringing. Then when he told Goldman, I turned in Dickey for the reward, and I'm going to get this reward, and he told the defense investigator, all I'm waiting on is this reward, and I can go start over with my new truck somewhere else. And then he tells the jury it was my Christian upbringing. Mr. Counsel, this is why the state chose to base its case on this individual, and this is why it's very tough for you to argue in response to Chief Judge McKee's question that this was not a thin case. But testimony isn't all or nothing, and what the prosecutor ended up arguing to the jury is he's a liar. He's a con. I'm going to stay with this here's a liar stuff because I think this is really at the heart of it. This is part of the prosecutor's argument to the jury. His, meaning Buchanan's, Buchanan's statement to Mel King, that's to say the investigator for the defense. This statement to Mel King, the only investigator who supplied him with money or his statement, the column made that confession. Now he's con-wise. This guy's taking me out to lunch. This guy's taking me out buying me beer. Why kill the goose that's laying the golden egg? You want to hear something, pal? Say whatever you want. Hey, let's have another quote 45. But did he ever, ever back out of that statement? In other words, he's saying he resisted the gift from the prosecutor, and what's missing from that is the jury has no idea of the gift that had been given to him by the prosecutor. Because, and I'm now reading from the California Supreme Court, while the jury did not know the role the prosecutor investigated played in facilitating the agreement between Buchanan and the landlord. Well, that's the key to the case. That is to say, Buchanan knew that he had this deal because the prosecutor had arranged it for him. And he lies on the stand saying, no, you never gave me a thing. And yet, here they are saying, well, he resisted because, you know, he got a few beers and he stuck with the story. Well, the missing part of that is, and the reason it's missing is because the prosecutor has induced a lie. The missing part of the story is he's gotten an awful lot more from the prosecutor. I mean, I find it very difficult to stomach that the prosecutor induces the lie and then builds on it in this way. Why is the jury not terribly misled by this? First of all, the prosecution turned over all of the evidence of the housing agreement. There's a very good, I'm sorry. Did the prosecutor turn over all the evidence of the facilitation that they played in the housing agreement? That's the only evidence the prosecution had. That's the only act that the prosecution took was facilitation. So why then does the prosecutor ask the question, did we ever give you anything? And he says, nothing ever. That's a lie. And he knows it's a lie. Because he had provided all evidence of the housing agreement to the defense. That question... Well, they didn't present to the defense the role that they'd played in facilitating that bringing about the housing agreement. If you read the housing agreement, which is, I believe it's on District Attorney letterhead and it's signed by all of the I'm talking about false testimony. He asked, did we ever give you anything? He says, no. This piece of paper would have showed the defense that that was false. I just told you, I'm not talking Brady. I'm talking NAPU. And under NAPU, is there an obligation to correct the lie that's put in? Well, that was one of the cases in my 28J letter. Well, that was the Seventh Circuit case. But in the Seventh Circuit case, that testimony was not elicited by the false testimony. It was not elicited by the prosecutors, it was elicited by the defense. And it was clear that the defense was laying a trap. They wanted to elicit false testimony so that they could get in and contradict it. This is the Second Circuit case? I'm sorry. Yes. Yes. That's what happened. The facts that you were stating were in the Seventh Circuit case. Yeah, yeah. So I don't view the Seventh Circuit case as having much bearing on what we're talking about here. If you take that Seventh Circuit case together with the footnote 34, Gimbeler v. Packman, there is no way to distinguish a NAPU claim where the prosecutor has been accused of suppressing evidence that testimony was false with a Brady disclosure. But I'm not talking about suppressing evidence, I'm talking about soliciting false testimony, which he did. You've talked to me a couple of times, right? Yes, a couple of times. But then he also says, have we ever bought you anything? Not a single thing, sir. And no correction. That's correct. And what, as opposing counsel mentioned, we would have to do a materiality analysis. We would have to imagine a trial where that alleged NAPU evidence came in. They told the jury, listen, it was 1202. Listen, they facilitated a housing agreement. Then the prosecutor would have responded. Well, this is something we do for every witness. All we gave him was the facilitation. We're not a party. We're not enforcing it. He could move out tomorrow, or he could move out in 10 years. So your argument is because they had it, it was not material. That's your argument? No, because they had it, because it was not suppressed, then it wasn't a NAPU violation. There is a disclosure. I thought, and the first thing I asked you was whether the state was contesting that those statements were false and were only about materiality, only contesting materiality on the NAPU claims. This is NAPU under a failure to correct. The failure to correct is simply a duty of disclosure. Hey, there's testimony here. I'm disclosing to you that testimony is false. No, but they didn't disclose it during trial. They disclosed the housing agreement, not the 2, not 12. I'm sorry, I was talking about one piece of evidence. Yeah, no, but you're saying- I'm talking about, I guess, an amalgamation. Well, no. We're talking about what's before us. The fact that the jury, it came out in front of the jury that he had met only a couple times, that was false. The prosecutor knew that was false. Yes, and the defense did not. Okay, and then we're talking about the arrangement that was made. The prosecutor knew that was false when he, misleading, however you want to, all right, and so you're saying it matters. That's what I'm getting to. It matters that the defense knew about the, that it was on the letterhead that said the DA's office, but that affects materiality. It affects the duty to correct. If the testimony is false, which it was, did you do, did the prosecution ever do anything for you? No, that's false. Immediately, and we're in agreement, opposing counsel and I are in agreement, the prosecutor had a duty to correct. However, that duty to correct was satisfied by disclosing the housing agreement. We did this. The defense already knows the testimony is false. So you think the California Supreme Court was incorrect when it decided that this was a NAPU violation because it left a false impression? I'm saying that what we would have to do is, when we do the omnibus sort of materiality analysis that we're talking about, what we have to do is we have to imagine what would happen in trial if all of the this wasn't disclosed to the jury. I'm sorry. This was not disclosed. The defense knew, the defense knew, but it wasn't disclosed to the jury. And isn't that the critical focus? In a materiality analysis, yes. We, we, yes. Sorry. I'm sorry. And so don't we do the mental exercise of saying, you know, given this colloquy, that what should have happened is the prosecutor should have made these corrections and the jury would have heard right then. Obviously through a fair-minded. Wait, wait, wait. Is that right? They would have heard it through the prosecutor, not waiting for the, somebody on cross-examination to come up with the thing on the letterhead. But that's what would have happened, right? That's what we imagined. The correction would have been made? It can be corrected. There's no Supreme Court precedent describing when or how a jury must be presented with correction of false testimony. For example, in this case. The NAPU duty is the prosecutor supposed to correct it, not that the defense is. There's a big difference between the prosecutor correcting it and the defense correcting it. Because if the prosecutor gets his witness to say X, and then the prosecutor says, but X isn't true, is it? Then it's pretty clear it's not true. But if the prosecutor gets the witness to say X, and then the defense comes in and says not X, then we got a he said, she said. So coming in to correct by the defense is not the same thing as the prosecutor correcting. And then here you have the additional, unfortunately, I think, but I don't know if you agree, a prosecutor sort of pounding the podium and in the closing saying, you know, hey, the defense is the one that did something for them. We didn't do anything for them. That is correct. And the state Supreme Court analyzed that by applying the Chapman standard, which is the equivalent of the NAPU materiality standard. And to answer a question, I think you asked opposing counsel in his argument, how do we, how do we perform this materiality standard? Is there any case that kind of explains what the materiality standard looks like? Well, because the California Supreme Court applied the Chapman standard, the equivalent of the NAPU materiality standard, we do have a Supreme Court case very recently, Brown versus Davenport that in the shackling context explained just how high a hurdle deferential Chapman analysis is. Now, the Supreme Court explained that even if a federal court is willing to grant habeas relief under Brett, deferential Chapman review can still foreclose habeas relief. Here we have the state Supreme Court essentially applying the Chapman standard. And under that deferential review, we have to look at all the evidence that was presented about the conflicting statements, the lie, the changing story. And we have to set that against the prosecutor's admissions exclamation. And under that deferential standard, we asked for the NAPU Brady evidence was simply, suppression of that evidence was simply harmless. Why couldn't we look at Dow? Well, Dow's not the, I'm sorry. Ninth Circuit case. I think that's probably one of the first reasons we wouldn't look at it is because we look to California, I'm sorry, we look to United States Supreme Court precedent to see whether or not the state Supreme Court unreasonably denied relief. It was NAPU? That Supreme Court case, which Supreme Court case are you talking about? No, it was, it's Brown versus Davenport, very recent, I think in the last year. So we have to say when you say deferential Chapman, you're saying we would have to be willing to say that the Supreme Court was, you know, on state Supreme Court unreasonable in deciding if there must be unreasonable Dow. Exactly, which is essentially, it's the equivalent that says Bagley in footnote nine, the Chapman standard is functionally equivalent. Right, that's what all these questions have been, I'm sorry, all these questions based it was we're trying to figure out whether that was unreasonable. Of course, that I mean, I thought you were telling me something different. So sorry, go ahead. But it's why it's why it comes back to bite the state. And it would whoever was standing at the podium today advocating for the state  Yes. Because it wasn't going to take very much. It wasn't going to take very much to for the jury to say he's lying to us, or at least he might be. To paraphrase the prosecutor, the truth can come from a priest just as much as it can from a devil. And I don't think that helps you know, that's what that was part of the prosecutor trying to you're trying to say, I think under Brady, you're arguing Brady, at least that doesn't help you. The fact that he lied so much in the poo hurts you. Because it just says any one little additional could made all the difference is what how I read the poo. Brady is like, well, they already knew. So that couldn't matter. It could make a difference. But because a fair minded jurist could argue that testimony isn't all or nothing. You can disbelieve a whole bunch of different things. In this case, the testimony, I just I don't know, we may just disagree. I don't know. I mean, testimony and the testimony of Buchanan, which your state prosecutor put a lot of emphasis on made it all or nothing. He was he was one part of the three prongs, the physical evidence, the witness Goldman's testimony in Buchanan. There was no physical evidence. What physical evidence? Fingerprint, ligature. What's a fingerprint on a blind in a house where he lives? I'm not saying it was dispositive of. OK, let me just we're just reviewing it. I realize now you're just going to go home, which was inconclusive, which was right. Fingerprint on a blind that you've got that. Yes. Blind in a closet where Dickie lives. Yes. All right. There's testimony about whether he did or did not open a drawer to get a knife. And and Goldman's, I think, uncontested testimony where she said her knife, just like the one used at the house, was in storage. That is correct. She testified to that. And what else? What other physical evidence? Then the ligature, which was cut from a blind, was found around the victim's neck. Which the expert, I thought, testified could not say that it came from that or not. Not it was. No, it was circumstantial that it came from. It was consistent. It was one of those. It's consistent with the three. The three pronged approach was the physical evidence struck me as just about non-existent as far as Mr. Dickie. Do you think I'm missing something? It was extremely necessary. I don't know. It wouldn't have done on its own for sure. OK, is that one prong of your three pronged approach that Buchanan and what? OK, and Goldman Goldman's testimony is exculpatory. I mean, the only thing Goldman says is that he confessed to me that he was there. He was crying and he said he had nothing to do with the killings. That's Goldman's testimony. Repeatedly. She said that, right? That's true. One of the things you have to read that in light of is Stokes testimony. Well, no, but you said you rely on Goldman's testimony. You now you're telling me you're relying on Stokes recounting of his testimony, which is, of course, hearsay. And I take some of that with a grain of salt because it's so flatly inconsistent with what Goldman says. I meant Goldman's statement. Does Stokes ever contradict or purport to say that Goldman represented that Dickey confessed to this having anything to do with the murder? I'm sorry, would you repeat the question? I don't know that I got it. I want to make sure that I'm not missing something. I don't think Stokes ever said that when in his conversations with Goldman, Goldman implicated Dickey in the murder. In the actual killing. Right. No, it was only in Aider and a better of the burglary and the robbery. Right. So when there's numerous references to Dickey confessing, and what I see here is him at most, if you believe, because he denies all that, but that he confessed to the plan to rob. Full stop. Is that fair? I'm sorry. The robbery, burglary, but not. He confessed to go with them and then he. To rob to get the money. I mean, that's that would be the case if you believe the canon. Anyway, I understand that Mr. Dickey denies that, but I'm just trying to make sure that if we look to the third part of your stool, the third leg of your stool or whatever is Goldman, and I don't think she ever goes there. I don't think she ever implicates him in a plan to murder. I misspoke. There's four legs of that stool. There's also. OK, I'm sorry. It's a chair now. Because Dickey took the stand, the jury was able to analyze his his credibility as well. OK, he denied everything. I've got one. I guess this is a comment more than a question, but you can certainly respond. What bothers me about this case with respect to the Napa violation is not just that the prosecutor put Buchanan on the stand and that Buchanan told lies that the prosecutor knew were lies. The prosecutor knowingly solicited the lies by his leading questions. So the prosecutor was complicit in the lies. He didn't really acquiesce in the lies. And then in closing argument, he capitalizes on the lies that he himself solicited. That's not a very pretty picture. Again, a material materiality analysis would go into would have to. But you're not defending the prosecutor on this, are you? I believe that the prosecutor would have had the ability to defend himself in front of the jury. I don't I don't want to condemn the prosecutor for necessarily knowing knowingly eliciting lies. No, wait a minute. He knew that he'd met with him at least 12 times. And he says, we met a couple of times, right? Yes, sir. And we didn't. And I'm paraphrasing. We did not give you anything of value, not a thing, sir. Those are lies. He's he's putting words into the mouth. Buchanan knows the answer he's supposed to give. The questions are asked in a way that's communicating to him the answer he's supposed to give. And both answers are lies. And the prosecutor knows it. The prosecutor had to look through his files to see how many times he had met with Buchanan. Oh, goodness sake. Come on. If I've met with somebody two times or 12 times, I know the difference. In a materiality analysis, the prosecutor would have gotten a chance to explain to the What about the prosecutors? Forgive me, Chief, could I just ask one? Am I right in recalling that in this argument, you've explained that you're not defending his failure to produce the notes of the time he became very angry with Buchanan because Buchanan tried to convince him that he had a secret deal with another DA? That should have been disclosed. That should have been disclosed. Thank you. And was there any consequences for that? Or any of the other non-disclosures? I don't know what you mean by consequences. For the prosecutor? I'm just curious. I don't know. I don't. Because usually for Brady violations, there's some action taking. I couldn't speak to that. I'm sorry. OK, thank you. I want to address a couple of quick points that were raised by the attorney general. The attorney general makes a point that the DA acknowledges that Buchanan is a liar in his argument. But he makes the point over and over again. But he didn't lie to you. He didn't lie to you. And he makes repeated arguments. And I quote, you have to take the essence of Gene Buchanan's story to the bank. You do. Buchanan deserves to have you listen to what he says when he comes into this courtroom. The truth can come out of the mouth of a drug addict just as well as it can come out of the mouth of a priest. That's not calling him a liar. That's calling him a liar, but saying he's telling the truth here to you. And the reason why there was no McHugh record correction at the trial is because, as Judge Fletcher's pointed out, he was complicit in the lies. He was the one that was bringing them out. Was he then going to go then and correct them? He didn't correct them. There was no McHugh record correction, and there's no McHugh analysis by the California Supreme Court. What would have happened if he had corrected, or if the judge had corrected, or if the state had come in and corrected the lies? But the California Supreme Court did, I think, we talked about this, except I don't think really got to it the first time you were at the podium. And I think what the California Supreme Court did is sort of weigh it. It's almost a sufficiency analysis, rather than saying what would have happened if the witness, because it is, to Judge Fletcher's point, it's the prosecutor's obligation to correct the misstatement from his own witness and not wait for a defense counsel. I think that's what was supposed to happen. The California Supreme Court, in its materiality analysis, did it two ways. They did it under McHugh. They say reasonable likelihood that the outcome would have been different if he hadn't lied. Now, would it have been different for the outcome? Could it have, reasonable likelihood, could it have been different if he had been corrected? Right, but my point is what it did when deciding that the outcome, that there wasn't, that these lies weren't material, was look at the other evidence in the record and decide the jury already knew that he was motivated to get the money. What the DA didn't know, upon record correction, is the DA was complicit in soliciting the lies. And when he says, he's a liar, but he's not lying to you, what do you say? And I'm a liar, too. And I'm the one that's been pulling all these things out and stringing them in front of you and pretending that he's got exposure for a capital charge if he's lying. I only met with him a couple of times. Didn't get a single thing, sir, $25,000 that the person owes me. And you're going to pay it back with a $5,000 reward even though you got $9,000 in benefits. All of these lies that he solicited, complicit in it, and strings it out. It's not like it's just blurted it out and then, oh, geez, I failed to correct that. No, no, no. He embeds it in the question, and he brings it out, and then he argues it over and over and over again. What about the Brady claims? What about the Brady claims? The Brady claims, I'll take issue with a couple of things that were said. First of all, the proper standard on materiality on Brady, in this case, is Al Gore's, and it's weird. It's not would it have been different. It's just the same as in the Pew. Could it have been different? You've briefed that point, but could you go through the analysis, please? I mean, I understand this point. I'm not sure it's going to be really productive today to use your time on that point, but I just... Just the analysis of who could it be? Well, it seems to me the prosecutor has clarified today that he's not defending that the notes, the prosecutor's notes, I mean the state's counsel, has agreed that the state's notes, prosecutor's notes regarding the time when Buchanan came to him and tried to con him into thinking that he had to deal with another DA should have been produced, impeaching evidence, so we're just going to do a materiality analysis, and the same is true that the prosecutor didn't come forward to say himself 12 visits. Right. So even if it would have made a difference, it seems to me, you've got an argument there, and you're not stressing it today. Is that because you think you only prevail if we buy into your weary argument? No, no, no, no.  Why? If the prosecutor had disclosed I had a meeting with Gene Buchanan, he either lied to me or he lied to the other person in the office that he had a deal that we were going to dismiss criminal charges against him in exchange for his testimony against him. Did we ever find out at the motion for the new trial why Buchanan didn't produce those notes? Why?  Did he ever say why he didn't produce them? I don't remember if he offered any explanation for not doing it. He just said that his lies brought him right out of his chair. I think if it was going to bring him right out of his chair, it would have brought the jury right out of his chair. When we do the materiality analysis in this particular case, and we do this not infrequently in Brady claims, but it seems to me in this case, we have to compare the withheld evidence, and you heard me ask opposing counsel about this, compare the withheld evidence against everything in the record, and that included the false statement. Correct. That's all I need. I think you're doing the analysis the same way I'm doing it, but I wanted to clarify. Thank you. Yeah, and I want to, there's much has been said about Detective Stokes here, and I just want to point out a couple of things about Detective Stokes. Thirty-three percent, on a page, thirty-three percent of his direct testimony is to impeach the state's witness. State's witness is Goldman. I'm sorry, say that again, you dropped your voice. Thirty-three percent of his direct testimony is to impeach the state's witness, Goldman. Thirty-three percent. Right, but why is opposing counsel wrong when he says the jury could have believed him and not Goldman? Goldman wasn't there, of course. She was, had passed away. Why is he wrong? Because Officer Stokes, who took an oath to uphold the law, took an oath to give sworn testimony, admits that his testimony was false to the jury. He admits that. RT-46-2122, a cross-examination. Everything you've been saying about this is wrong, isn't it? And he admits to lying. It circles back to, now you distrust the witness, and now you can disregard everything he's saying. RT-46-21 what? No, this is Stokes, yeah, this is this. Stokes, 46-21-22. 46, say it, say it, I'm sorry. Page 46-21, over to 22. And there, your representation is that, I don't need a verbatim, but that Stokes says what? Admits that Goldman did not say she overheard RC tell Colin it would be an easy rip-off, or that she saw them put on hats and gloves before leaving. He had this whole tale on direct, that's just making it up, not on cross-examination. He admits, he admits to testifying falsely. That whole, and I would encourage the court to read, to read the entire record in conduct, but the admission of testifying falsely is at 46-21-22. And it's outrageous. So one thing I'll point out that the Attorney General, Respondent, does not rely on the testimony of Stokes in his brief. He relies on two witnesses. He says they're under attack, two witnesses. And that's in, Respondent concedes at ECF-22 or 36, the physical evidence connecting Petitioner to the crimes was not strong. The establishment of guilt depended on two witnesses, subject to a rigorous attack. It's Goldman and it's Buchanan, I presume. It didn't depend on Stokes' testimony. Stokes was wiped out by his own falsehoods that he admitted to on cross-examination. I want to point out to this court, the difference between the California Supreme Court analysis and what the proper analysis is under the Pew. And I'm quoting the Pew. Had the jury been apprised of the true facts, that's the analysis that the Pew requires. Well, that's opposing counsel's point. He says the standard was met because the agreement, you know, the rental agreement with Strickland was produced. What we have suggested is that it is a prosecutor's burden to make that correction. But what you're quoting right there, it seems to me to be much more equivocal. More equivocal? Yes. Had the jury been apprised? It doesn't say who has to apprise them. Is there another part of the Pew you're relying upon? No, no, no, but the point being, the analysis by the court on the Pew materiality is, what would have happened had the jury been apprised? I understand that. Do you want to make a concluding statement? I do have a concluding statement. And I, as you can tell, and I apologize for my vocal volume. But this is important. This is very important. And this false testimony, and I just want to read a couple of things. You shall not give false testimony against your neighbor. That's from Exodus. Ten Commandments. Theologian and prolific author Timothy Keller states, the Ten Commandments are by far the most influential ethical set of directions in the history of the world. 500 years later, when writing the book of Proverbs, Solomon reiterated these commandments three times. 900 years later, perhaps most famous and well-referenced sermon in the history of the Sermon on the Mount, Jesus further explained this commandment regarding oaths in very simple yet inflexible terms. Let your yes be yes, and your no be no. Ten Commandments address something far more focused and insidious than simply lying. It relates to testimony, it relates to judicial proceedings, and it involves your neighbor. Louis Smeeds, philosopher, theologian, author, longtime professor here in Pasadena, Fuller Theological Seminary, said this about the commandment. Truthfulness is an invisible fiber that holds the people together in humane community. As eloquently stated by Justice John Paul Stevens, More importantly, providing false testimony against your neighbor is, quote, about the corruption of the truth-seeking function of the trial process. People bear false witness against their neighbor for two reasons. One, it hurts them. Two, it helps you. That's exactly what the people of the state of California have done here. They have knowingly presented false testimony against their neighbor, Colin Dickey, and they did so for a very fundamental purpose because it's reasonably likely that if you told the truth, the outcome could have been different. Why else would anybody give false testimony against their neighbor? That is an acute constitutional violation that warrants relief here. Thank you very much. Thank you. Thank you both for your oral argument presentations today. The case of Colin Raker-Dickey versus Ronald Davis is now submitted. We are adjourned. Thank you.
judges: MURGUIA, FLETCHER, CHRISTEN